1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BAHAR MIKHAK,

            Plaintiff,

   v.

UNIVERSITY OF PHOENIX,

            Defendant.

_____/

No. C16-00901 CRB

**ORDER GRANTING MOTION TO
COMPEL ARBITRATION**

Now pending is Defendant's Motion to Compel Arbitration. <u>See generally</u> Mot. (dkt. 14) at 2. Defendant University of Phoenix (hereafter "University") is a global higher education institution offering degree programs online and at more than 100 locations across the United States. <u>Id.</u> Plaintiff Bahar Mikhak is a former faculty candidate denied a full-time faculty position. Opp'n (dkt. 18) at 1–2. Upon denial, Mikhak filed unsuccessful employment discrimination claims with the Equal Employment Opportunity Commission. Compl. (dkt. 1) ¶¶ 16–17. Mikhak then filed a complaint in the Northern District of California alleging ten counts of unlawful discrimination on the basis of religion, and related claims in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e)-2(a)(1), the California Fair Employment and Housing Act, Cal. Gov't Code § 12940, and Article 1, Section 8 of the California Constitution. <u>See generally</u> Compl. The University now moves to compel arbitration in accordance with an agreement in the University Faculty Handbook that Mikhak signed consenting to arbitrate all employment-related disputes. Mot. at 1.

As explained below, the Court hereby GRANTS the Motion to Compel Arbitration and STAYS the action pending the outcome of arbitration.

## I.    BACKGROUND

The University employed Mikhak for one quarter, from April 28, 2014, until October 13, 2014, as a faculty candidate at its Livermore, California, location.  Compl. ¶ 13.  During that time, Mikhak participated in the University's three-phased process for faculty hiring: the Assessment, Certification and Mentorship phases.  Id. ¶ 21.  As part of the Mentorship phase, Mikhak taught "Research Methods for Mental Health Counselors" under the supervision of her assigned mentor.  Id. ¶¶ 23, 30.

On several occasions during her Certification and Mentorship phases, Mikhak alleges that she perceived bias against her on the basis of religion.  See, e.g., id. ¶¶ 29, 33, 55.  Mikhak is a Muslim Submitter of Iranian descent.  Id. ¶ 11.  In accordance with her beliefs and the daily exercise of her religion, whenever Mikhak contemplates a future action, she utters the phrase "God willing."  Id.  According to Mikhak, she first perceived bias during her second mock teaching demonstration, when the College Campus Chair, Dr. Ryan Berman, "stood outside [the classroom] . . . awkwardly staring at her."  Id. ¶ 28.  As her course progressed, Mikhak says that Berman subjected her to in-depth inquiry, such as conducting unexpected classroom visits and questions about her pedagogical methods.  See id. ¶¶ 30–55.  At the same time, Berman allegedly demanded her to justify her utterance of "God willing," which he reported offended students.  Id. ¶¶ 37–55.  Mikhak contends that she faced repeated complaints that appeared religiously motivated, including that "students did not feel comfortable in the classroom," that she would retaliate against them in her grading, and that she changed her behavior when her mentor was present.  Id. ¶ 64; see generally id. ¶¶ 47–75.  According to her, these experiences detrimentally affected her health and well-being.  Id. ¶ 67.  At the end of Mikhak's Mentorship phase, despite a positive recommendation from her mentor, the University did not invite her to become a full-time faculty member.  Id. ¶¶ 76–85.

The University provided Mikhak with its 2014–2015 Faculty Handbook, which

2

**United States District Court**
For the Northern District of California

1    included a new Dispute Resolution Policy and Procedure and a binding arbitration

2    agreement.  Mot. at 3.  The arbitration agreement "applie[d] to any covered dispute arising

3    out of or related to the faculty member's employment with and interactions with the

4    University" and required resolution of all disputes "only by an arbitrator . . . and not by way

5    of court or jury trial."  Id. at 3–4.  The University emailed a link to all faculty members and

6    uploaded the document to its eCampus online web portal, "the main University interface

7    between faculty and prospective faculty and his or her students."  Id.  All faculty members

8    had to acknowledge receipt and understanding of the handbook by clicking "Accept" on the

9    "Faculty Acknowledgment Detail" webpage.  Id. at 3.

10        According to Mikhak, the University first provided her with an outdated 2011–2012

11   handbook that lacked any information about arbitration.  Mikhak Decl. (dkt. 18-1) ¶ 16.  The

12   University shared the updated 2014–2015 version with the provision included on February

13   28, one week before requiring acknowledgment.  Id. ¶ 18; Mot. at 3.  Mikhak clicked

14   "Accept" and thereby acknowledged that she "agree[d] to arbitrate employment-related legal

15   claims" on March 7, 2014.  Mot. at 4.  On September 27, 2014, Mikhak accepted an

16   Addendum Acknowledgment to the handbook, the content of which was unrelated to the

17   arbitration agreement, declaring a second time that she "underst[ood] and agree[d] to abide

18   by the policies set forth in the 2014–2015 Faculty Handbook . . . [her] continued employment

19   with the University is evidence of said agreement."  Id. at 5.

20        After exhausting her administrative remedies to address her alleged discrimination,

21   Mikhak filed her complaint on February 26, 2016.  See generally Compl.  The University's

22   Motion to Compel Arbitration followed.

23   **II.     LEGAL STANDARD**

24        The Federal Arbitration Act (FAA) provides that an agreement to submit commercial

25   disputes to arbitration shall be "valid, irrevocable, and enforceable, save upon such grounds

26   as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Such

27   commercial disputes include the employment context.  See Circuit City Stores, Inc. v.

28   Adams, 532 U.S. 105, 109 (2001).  The FAA places arbitration agreements on "an equal

footing with other contracts and requires that private agreements to arbitrate are enforced according to their terms." Rent-A-Ctr. West, Inc. v. Jackson, 561 U.S. 63, 67 (2010) (internal citations omitted).  A party may petition a court to compel "arbitration [to] proceed in the manner provided for in such agreement."  9 U.S.C. § 4.

Generally "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986).  However, courts have developed a "liberal federal policy favoring arbitration agreements." AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011).  A district court's role under the FAA is limited to determining "(1) whether a valid agreement to arbitrate exists, and if it does, (2) whether that agreement encompasses the dispute at issue. If the response is affirmative on both counts, then the Act requires the court to enforce the arbitration agreement in accordance with its terms." Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000); see also Howsam v. Dean Witter Reynolds, 537 U.S. 79, 84 (2002).

Arbitration agreements are "a matter of contract" and "may be invalidated by generally applicable contract defenses, such as fraud, duress or unconscionability." Rent-A-Ctr., 561 U.S. at 67–68.  Parties may "agree to limit the issues subject to arbitration" and "to arbitrate according to specific rules." Concepcion, 563 U.S. at 345.  "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." Green Tree Fin. Corp.-Alabama v. Randolph, 531 U.S. 79, 81 (2000).

## III.   DISCUSSION

The University's agreement stipulates that the FAA controls, which Mikhak does not contest.  See Mot. at 3; Taylor Decl. Ex. B (dkt. 14-4) ¶ 1; Opp'n at 3.  Rather, Mikhak disputes (A) the arbitrability of her claims; (B) the validity of the arbitration agreement; (C) the enforceability of the agreement on unconscionability grounds; and (D) the validity of the agreement to arbitrate Title VII claims.  See generally Opp'n.

### A.   Arbitrability

The "gateway" question of arbitrability refers to "whether the parties have submitted a

particular dispute to arbitration." <u>Howsam</u>, 537 U.S. at 83.  <u>See also</u> <u>Rent-A-Ctr.</u>, 561 U.S. at 68–89.  "[T]he federal policy in favor of arbitration does not extend to deciding questions of arbitrability." <u>Oracle Am., Inc., v. Myriad Grp., A.G.</u>, 724 F.3d 1069, 1072 (9th Cir. 2013).  Courts should presume that they determine arbitrability absent "clea[r] and unmistakabl[e] evidence" that the parties agreed to delegate that question to an arbitrator. <u>Howsam</u>, 537 U.S. at 83; <u>see also</u> <u>First Options of Chi., Inc. v. Kaplan</u>, 514 U.S. 938, 939 (1995).  Such clear and unmistakable evidence can include "a course of conduct demonstrating assent . . . or . . . an express agreement." <u>Momot v. Mastro</u>, 652 F.3d 982, 988 (9th Cir. 2011) (omissions in text).[1]  Courts should not necessarily resolve ambiguities regarding the delegation of arbitrability in favor of arbitration, <u>see</u> <u>First Options</u>, 514 U.S. at 944–45, nor should they apply "ordinary state-law principles that govern the formation of contracts" as they normally would, <u>Momot</u>, 652 F.3d at 987–88.

Here, the University argues that the agreement "clearly and mistakably delegates gateway issues of arbitrability to the arbitrator" because it covers all "disputes arising out of or relating to interpretation or application of this Arbitration Agreement."  Mot. at 11.  That the agreement incorporates the National Employment Arbitration Procedures of the American Arbitration Association (AAA), <u>see</u> Taylor Decl. Ex. B ¶ 3, further delegates arbitrability to the arbitrator.  <u>See</u> Mot. at 11.

<u>Brennan</u> held that incorporation of AAA rules constituted clear and unmistakable evidence of intent to arbitrate arbitrability.  <u>Brennan v. Opus Bank</u>, 769 F.3d 1125, 1130 (9th Cir. 2015).  <u>Oracle</u> previously suggested that its arbitrability delegation rule applied only to agreements between "sophisticated parties." <u>Oracle</u>, 724 F.3d at 1075.  Joining the "vast majority of the circuits," <u>Brennan</u> did not wish to "foreclose the possibility" that

_____

[1]   Some courts have also inquired as to whether the assertion of arbitrability is "wholly groundless." <u>See</u> Qualcomm Inc. v. Nokia Corp., 466 F.3d 1366, 1371 (Fed. Cir. 2006) (applying Ninth Circuit law); <u>see, e.g.</u>, Galen v. Redfin Corp., No. 14-cv-05229-TEH, 2015 WL 7734137, at *5–*6 (N.D. Cal. Dec. 1, 2015) (Henderson, J.); Khraibut v. Chahal, No. C15-04463-CRB, 2016 WL 1070662, at *6 (N.D. Cal. Mar. 18, 2016) (Breyer, J.).  Yet Ninth Circuit law has not explicitly required this second step, and many courts have not applied it in their analysis.  <u>See generally</u> Brennan, 769 F.3d at 1130–32; <u>see, e.g.</u>, Meadows v. Dickey's Barbecue Restaurants (Dickey's), No. 15-cv-02139-JST, 2015 WL 7015396 (N.D. Cal. Nov. 11, 2015) (Tigar, J.).

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

"unsophisticated" parties whose agreement incorporated AAA rules could also manifest clear and unmistakable evidence of intent to arbitrate arbitrability.  Brennan, 796 F.3d at 1130–31.  Nonetheless, the court left open the circumstances of unsophisticated parties raised by Oracle and said that it would not ". . . decide here the effect if any of incorporating AAA rules . . . into contracts of any nature between unsophisticated parties."  Id. at 1131 (internal quotations omitted); see also Oracle 724 F.3d at 1075 n.2.  The court "limit[ed]" its holding to an arbitration clause between two "sophisticated parties" in that case, "an experienced attorney and businessman . . . who executed an executive-level employment contract" and "a sophisticated, regional financial institution."  Brennan, 796 F.3d at 1131.  Incorporation of AAA rules sufficed to show their intent to delegate arbitrability.  Id.

Subsequent to Brennan, district courts within the Ninth Circuit have not resolved if unsophisticated parties can possess the clear and unmistakable evidence of intent to arbitrate.[2]  In Dickey's, the court ruled that an assessment of clear and unmistakable intent to arbitrate between two parties must "first consider the position of those parties."  See Meadows v. Dickey's Barbecue Restaurants (Dickey's), No. 15-cv-02139-JST, 2015 WL 7015396, at *6 (N.D. Cal. Nov. 11, 2015) (Tigar, J.) (quoting Rent-A-Ctr., 516 U.S. at 70 n.1 ("explaining that the 'clear and unmistakable' requirement is an 'interpretive rule,' based on an assumption about the parties' expectations")).  The Dickey's plaintiffs represented a putative class of franchisees and owners of Dickey's Barbeque Restaurants.  Id. at *1.  Dickey's moved to compel arbitration based on a franchise agreement that encompassed "all disputes  . . . arising out of or relating to this agreement" and "incorporate[d] by reference the commercial rules of the AAA."  Id. at *4–*5.  The court concluded that it was

---

[2]  Compare Money Mailer, LLC, v. Brewer, No. C15-1215RSL, 2016 WL 1393492, at *3 (E.D. Wash. Apr. 8, 2016) (Lasnik, J.) (on appeal);  Vargas v. Delivery Outsourcing, LLC, No. 15-cv-03408-JST, 2016 WL 946112, at *7–*8 (N.D. Cal. Mar. 14, 2016) (Tigar, J.); Dickey's, 2015 WL 7015396, at *5–*7 (Tigar, J.); E & E Co., Ltd. v. Light in the Box Limited, No. 15-cv-00069-EMC, 2015 WL 5915432, at *7 (N.D. Cal. Oct. 9, 2015) (Chen, J.); (all finding the delegation clauses at issue unenforceable and thereby reserving arbitrability questions for the court) with Khraibut, 2016 WL 1070662, at *6 (Breyer, J.), Shierkatz Rllp v. Square, Inc., No. 15-cv-02202-JST,  2015 WL 9258082, at *6 (N.D. Cal. Dec. 17, 2015) (Tigar, J.); Galen, 2015 WL 7734137, at *7 (Henderson, J.); Baysand Inc. v. Toshiba Corp., No. 15-cv-02425-BLF, 2015 WL 7283651, at *6 (N.D. Cal. Nov. 19, 2015) (Freeman, J.) (all finding clear and unmistakable evidence to delegate arbitrability).

United States District Court
For the Northern District of California

1  unreasonable to expect that an "inexperienced individual, untrained in the law," would

2  understand that the language of an arbitration agreement provided clear and unmistakable

3  evidence of arbitrability.  Id. at *6.  The individual <u>Dickey's</u> plaintiffs were "each far less

4  sophisticated than Dickey's," and had to agree to a "complicated, 60-page agreement drafted

5  by Dickey's"; they apparently had no "legal training or experience dealing with complicated

6  contracts." Id.  Because these parties were not sophisticated, the court held that the <u>Brennan</u>

7  rule did not apply in this context, and the court reserved the question of arbitrability rather

8  than delegating it to an arbitrator.  Id. at *7.

9       Conversely, <u>Galen</u> upheld an arbitrability delegation clause in an independent

10  contractor agreement signed between the employer Redfin and the plaintiff.  <u>Galen v. Redfin</u>

11  <u>Corp.</u>, No. 14-cv-05229-TEH, 2015 WL 7734137, at *7 (N.D. Cal. Dec. 1, 2015)

12  (Henderson, J.).  The agreement encompassed "[a]ll disputes among the parties" and

13  incorporated AAA rules.  Id. at *1 ("Any arbitration shall be conducted in accordance with

14  the rules of the American Arbitration Association then in effect").  The court found that the

15  plaintiffs possessed "at least a modicum of sophistication" because they were real estate

16  agents required to obtain a professional license.  Id. at *7.  This enabled the court to rule that

17  the parties clearly and unmistakably delegated arbitrability.  Id.

18       Also, in <u>Khraibut</u>, this Court enforced a delegation clause in a non-disclosure

19  agreement between an entrepreneur and the defendant founder of the technology start-up

20  firm Gravity4.  <u>Khraibut v. Chahal</u>, No. C15-04463-CRB, 2016 WL 1070662, at *6 (N.D.

21  Cal. Mar. 18, 2016) (Breyer, J.).  The agreement stipulated that "any disputes or

22  controversies . . . shall be subject to binding arbitration" that would be "administered by the

23  [AAA] in accordance with its Rules." See id. at *1.  The Court followed <u>Brennan</u> and

24  "defer[red] to the AAA's Rules on arbitrability." Id. at *5.  The <u>Khraibut</u> plaintiff was "at

25  least minimally sophisticated," as he was a "savvy entrepreneur in his own right" with

26  previous "dealings in the business world." Id. at *6.  Consequently, the Court found that

27  there was "clear and unmistakable evidence of delegation." Id.

28       The Court first considers the "gateway" question of arbitrability in the instant case.

See Rent-A-Ctr., 561 U.S. at 68–69.  The University's arbitration agreement "applies to any covered dispute arising out of or related to the faculty member's employment with and interactions with the University . . . [including] disputes arising out of or relating to interpretation or application" of the agreement.  Taylor Decl. Ex. B. ¶ 1. The University argues that this broad clause "clearly and unmistakably" demonstrates the parties' intent to arbitrate arbitrability.  See Mot. at 11; Reply (dkt. 21) at 4.  Mikhak does not directly dispute the arbitrability of the agreement except by seeking to invalidate it through standard contract law defenses, such lack of mutual assent.  See Opp'n at 4.  Notwithstanding the question of assent to the contract, discussed infra Section B, the presence of an "express agreement" itself is potentially enough to establish potentially clear and unmistakable evidence of intent to arbitrate arbitrability.  See Momot, 652 F.3d at 988.  Also contrary to Mikhak's briefing, the arbitrability inquiry should not turn on ordinary contract defenses.  See Opp'n at 4; Momot, 652 F.3d at 987–88.

Here, the broad nature of the arbitration agreement should not weigh heavily in the analysis.  The agreement's language of "any covered dispute" is similar to the broad language in the challenged clauses in Dickey's, Galen, and Khraibut.  See Dickey's, 2015 WL 7015396, at *2; Galen, 2015 WL 7734137, at *1; Khraibut, 2016 WL 1070662, at *1. More critical is whether the parties are "sophisticated," and if that finding is dispositive. There is little question that the University qualifies as a sophisticated party.  It operates online and at more than 100 locations across the U.S. and worldwide.  Mot. at 2.  On the other hand, courts have been unclear on whether a non-law professor qualifies as a sophisticated party in the arbitrability and employment context (if, indeed, sophistication is required).  Mikhak is a former researcher and only recently started to apply to teaching positions.  Mikhak Decl. ¶ 29.  She possesses graduate degrees in Epidemiology and Biostatistics, and Genetic and Molecular Epidemiology, and she has taught epidemiology courses online and in person.  Compl. ¶¶ 25–26.  Mikhak likely had previously signed employment contracts with universities, and she is undoubtedly intelligent.  As an experienced professor, she might have the sufficient "modicum of sophistication" to express

United States District Court
For the Northern District of California

intent to arbitrate arbitrability.  See Galen, 2015 WL 7734137, at *7.  Yet based on her field

of study, concluding that she is sophisticated in this context is more difficult.  She is not a

"savvy entrepreneur" with prior "dealings in the business world," see Khaibut, 2016 WL

1070662, at *6, she does not possess a professional license in a legal or related field, see

Galen, 2015 WL 7734137, at *7, and she certainly is not an "experienced attorney and

business[wo]man," see Brennan, 796 F.3d at 1131.  Her situation might be more analogous to

the inexperienced Dickey's plaintiffs who had no evidence of "legal training or experience

dealing with complicated contracts," and who had to sign a "complicated, 60-page

agreement" replete with "a myriad of legal terms."  See Dickey's, 2015 WL 7015396, at *6.

Mikhak had to accept electronically "a number of terms" presented in response to "a number

of documents" related to her hiring, including the 2014–2015 Faculty Handbook, which she

felt was "misleading" and contained "inconsistencies."  Mikhak Decl. ¶¶ 9, 15.  Such a

barrage of materials might understandably seem confusing to an individual without

experience reviewing legal documents or negotiating employment contracts.  Because the

courts remain divided on whether parties must be sophisticated to delegate arbitrability and

because Mikhak's sophistication is subject to dispute, it is not certain that Mikhak clearly and

unmistakably delegated arbitrability.  Absent that evidence, courts should not presume

delegation of arbitrability.  See Howsam, 537 U.S. at 83.  The Court therefore reserves its

authority to determine arbitrability and refuses to delegate that question to the arbitrator.

### B.     Valid Contract

Even if courts reserve the determination of arbitrability, they can still enforce the

remainder of the arbitration agreement by applying state-law contract principles.  See Rent-

A-Ctr., 561 U.S. at 70–71, 79.  Under the FAA, arbitration agreements can be declared

unenforceable "upon such grounds as exist at law or in equity for the revocation of any

contract."  9 U.S.C. § 2.  Yet the FAA controls to "ensur[e] that private arbitration

agreements are enforced," as nothing in Section 2 "preserve[s] state-law rules that stand as an

obstacle to the accomplishment of the FAA's objectives."  Concepcion, 563 U.S. at 343–44.

The FAA preempts "[a]ny general state-law contract defense, based in unconscionability or

United States District Court
For the Northern District of California

1  otherwise, that has a disproportionate effect on arbitration."  <u>Mortensen v. Bresnan</u>, 722 F.3d

2  1151, 1159 (9th Cir. 2013).

3       In California, a valid contract exists if (1) the parties are "capable of contracting";

4  (2) they manifested "[t]heir consent" to be bound; (3) there was a "lawful object"; and

5  (4) there was "sufficient cause or consideration."  Cal. Civ. Code § 1550; <u>United States ex.</u>

6  <u>rel. Oliver v. The Parsons Co.</u>, 195 F.3d 457, 462 (9th Cir. 1999).  The parties do not contest

7  their capacity to contract, <u>see</u> Mot. at 10; <u>see generally</u> Opp'n at 4–7, the presence of a lawful

8  object, <u>see</u> Mot. at 9; <u>see generally</u> Opp'n at 4–7, or the existence of consideration, <u>see</u> Mot.

9  at 9–10; <u>see generally</u> Opp'n at 4–7.  Therefore, the critical issue is if the parties mutually

10  consented to the agreement, and if as a faculty candidate, Mikhak falls within its scope.

11          **1.**    **Mutual Assent**

12       Contracting parties manifest mutual assent when a "specific offer is communicated to

13  the offeree, and an acceptance is subsequently communicated to the offeror."  <u>Netbula, LLC</u>

14  <u>v. BindView Dev. Corp.</u>, 516 F. Supp. 1137, 1155 (N.D. Cal. 2007) (Jenkins, J.); <u>see also</u>

15  Restatement (Second) of Contracts § 17 (Am. Law Inst. 1981).  It is determined through the

16  "reasonable meaning of the words and acts of the parties."  <u>Netbula</u>, 516 F. Supp. at 1155.

17  Mikhak accepted the terms of the arbitration agreement by expressly clicking "Accept" on

18  the Faculty Acknowledgment Detail on March 7, 2014, and September 27, 2014.  <u>See</u>

19  Mortensen Decl. (dkt. 14-3)  ¶¶ 7–8.  This indicated that she "underst[ood] and affirm[ed]

20  that by clicking 'accept,'" she agreed "to arbitrate employment-related claims" and to

21  "waiv[e] [her] right to have such claims decided by a judge or jury in federal or state court."

22  <u>Id.</u> Ex. 3.  Mikhak acknowledges that she clicked "Accept" to the faculty handbook, but

23  asserts that her acceptance was "prior to the UOP educating the faculty candidates on the

24  [new] Faculty Handbook" which included the arbitration agreement for the first time.

25  Mikhak Decl. ¶ 19.  She received email notice on February 28, 2014, that the new handbook

26  was available and would be effective on March 7.  <u>See</u> Taylor Decl. Ex. A.  She therefore

27  had one week to review the handbook, which should have been sufficient.

28       According to Mikhak, a valid contract requires "the terms establishing what is covered

1    in the contract." See Opp'n at 4.  The University fulfilled this requirement by making

2    available the handbook that included the arbitration agreement.  In California, an employee

3    can agree to arbitration by "signing an acknowledgment form that incorporates the

4    employer's employee handbook and the arbitration policy it contains" as long as "the terms

5    of the incorporated document . . .  [are] known or easily available to the contracting parties."

6    Avery v. Integrated Healthcare Holdings, Inc., 218 Cal. App. 4th 50, 66 (Ct. App. 2013); see

7    also Ashbey v. Archstone Prop. Mgmt, Inc., 612 Fed. Appx. 430, 431 (9th Cir. 2015).  The

8    email to notify Mikhak and other faculty members made the terms easily available by

9    providing a link to the updated handbook.  See Taylor Decl. Ex. A.  ("You can access the

10    Faculty Handbook here").  In clicking "Accept" to the Faculty Acknowledgment Detail and

11    the Addendum Agreement, Mikhak consented twice to "understand[ing] and agree[ing] to

12    abide by the policies set forth in the 2014–2015 Faculty Handbook."  Mortensen Decl. Exs.

13    3, 6. Moreover, Mikhak's continued employment after receiving the revised handbook

14    demonstrates her assent to the terms.  See Davis v. Nordstrom, Inc., 755 F.3d 1089, 1093

15    (9th Cir. 2014) ("Where an employee continues in his or her employment after being given

16    notice of the changed terms or conditions, he or she has accepted those new terms or

17    conditions.").

18         Mikhak's argument that she failed to assent because there was "no written document

19    with signatures affixed to the last, or any page" is also not persuasive.  See Opp'n at 4.

20    Electronic signatures and clicking "Accept" are valid means of expressing assent to a

21    contract.  See Cal. Civ. Code § 1633.7(b) (adopting the Uniform Electronic Transactions Act

22    (UETA) and stating that "[a] contract may not be denied legal effect or enforceability solely

23    because an electronic record was used in its formation"); see, e.g., Specht v. Netscape

24    Commc'ns Corp., 306 F.3d 17, 22 n.4 (2d Cir. 2002) (Sotomayor, J.) (finding that "clicking

25    on a webpage's clickwrap button . . . has been held by some courts to manifest an Internet

26

27

28

United States District Court
For the Northern District of California

user's assent to terms");[3] <u>Tabliabue v. J.C. Penney Corp.</u>, 15-cv-01443-SAB, 2015 WL 8780577, at *2 (E.D. Cal. Dec. 15, 2015) (finding that an electronic signature is sufficient to render a valid arbitration contract).

At the motion hearing, Mikhak suggested that under the UETA, the parties must agree that an electronic signature is valid. California's statute adopting the UETA "applies only to a transaction between parties each of which has agreed to conduct the transaction by electronic means. Whether the parties agree to conduct a transaction by electronic means is determined <u>from the context and surrounding circumstances, including the parties' conduct</u>." Cal. Civ. Code § 1633.5(b) (emphasis added). Mikhak's counsel referred the Court to <u>J.B.B. Investment Partners, Ltd. v. Fair</u>, 232 Cal. App. 4th 974, 990–91 (Ct. App. 2014), wherein the court held that a defendant's printed name at the end of an email did not amount to an electronic signature sufficient to enforce settlement terms to which the parties allegedly agreed. While the court agreed that "a printed name or some other symbol might, under specific circumstances, be a signature under the UETA," "[a]ttributing the name on an e-mail to a particular person and determining that the printed name is '[t]he act of [this] person' is . . . insufficient, by itself, to establish that it is an 'electronic signature.'" <u>Id.</u> at 988–89. Electronic signatures must be "executed or adopted by a person with the intent to sign the electronic record." <u>Id.</u> at 989 (quoting Cal. Civ. Code § 1633.2(h)). Printing one's name at the end of an email did not evince "any intent to formalize an electronic transaction." <u>Id.</u>

The circumstances here differ from <u>Fair</u>. The University's agreement did not require Mikhak's signature but that she click "Accept" on the Faculty Acknowledgment Detail. <u>See</u> Mortensen Decl. ¶¶ 4–6. The Court determines Mikhak's intent to agree electronically "from

---

[3] Mikhak's counsel did not recall the name of this Second Circuit case at the motion hearing, and offered to submit it following the hearing; the Court explained that it would not allow the introduction of new authorities at that point. Nonetheless, counsel submitted the citation in a letter following the hearing, Pl.'s letter of 6/16/2016 (dkt. 25), and the University objected, Def.'s letter of 6/16/2016 (dkt. 26). Setting aside the propriety of the submission, the Court finds <u>Specht</u> both distinguishable and unfavorable to Mikhak. That case dealt with an arbitration clause in a scrolling webpage acceptance. <u>See Specht</u>, 306 F.3d at 21–25. <u>Specht</u> held that in California, clicking on a button "does not communicate assent to contractual terms if the offer did not make clear to the consumer that clicking . . . would signify assent to those terms." <u>Id.</u> at 29–30. Here, the University made it clear that "by clicking 'accept' below I am agreeing to arbitrate employment-related legal claims . . . ." <u>See</u> Mortensen Decl. Ex. 3.

United States District Court
For the Northern District of California

1    the context and surrounding circumstances."  See Cal. Civ. Code § 1633.5(b).  By clicking

2    "Accept," Mikhak manifested intent to "acknowledge" having read the handbook and to

3    "understand and agree to abide by the policies set forth" in it.  See Mortensen Decl. Ex. 3.

4    Her conduct therefore demonstrated intent "to conduct the transaction by electronic means,"

5    see Cal. Civ. Code § 1633.5(b), unlike the simple signing of an email in Fair.  See Fair, 232

6    Cal. App. 4th at 981.  By clicking "Accept" on two separate occasions, Mikhak assented to

7    the terms of the arbitration agreement.

8                    **2.        Contract's Scope**

9           Mikhak next argues that when she clicked "Accept," she understood that the

10   handbook's policies would apply to her only once she became a full-time faculty member.

11   See Opp'n at 5.  She asserts that while she was still in the Mentorship phase, she was not yet

12   a "'current' Faculty member" but "considered a 'Faculty candidate.'"  Mikhak Decl. ¶ 24.

13          Whether Mikhak qualifies as a faculty member within the scope of the agreement is a

14   question of contract interpretation.  In California, "[t]he whole of a contract is to be taken

15   together, so as to give effect to every part, if reasonably practicable, each clause helping to

16   interpret the other."  Cal. Civ. Code § 1641.  Courts should construe a contract's language

17   "in the context of that instrument as a whole, and in the circumstances of that case."  Cty. of

18   San Diego v. Ace Prop. & Cas. Ins. Co., 37 Cal. 4th 406, 415 (2005).

19          Mikhak's interpretation is wrong for two reasons.  First, by construing the language of

20   the overall handbook "in the context of that instrument as a whole," see Ace Prop., 37 Cal.

21   4th at 415, it is clear that faculty candidates who teach a course—like Mikhak, who worked

22   "for one quarter as a faculty candidate of one course"—count as members of the Associate

23   Faculty included in the Faculty Model.  See Compl.¶ 13; Mot. at 3; Opp'n at 1; Mikhak Decl.

24   Ex. B.  The "Faculty Model," which is the "experienced team of faculty who are involved in

25   the faculty governance and teaching activities," includes "Core Faculty (full-time) and

26   Associate Faculty."  Taylor Decl. (dkt. 21-1)  ("Taylor Decl. II") Ex. A.  The Core Faculty

27   comprises "Full-Time Faculty, Administrative Faculty and the Lead Faculty," whereas the

28   "Associate Faculty" includes "[t]he remainder of the faculty, those whose teaching

                                                13

assignments are based on individual courses and activities." <u>Id.</u>  At the motion hearing, Mikhak cited seventeen instances in the handbook in which the language apparently distinguishes between faculty members and faculty candidates.  For example, Mikhak apparently interpreted the language in Section 8.1, that "Faculty candidates are invited to join the faculty after successful completion of both certification and a mentorship course," to mean that she was not yet a faculty member.  <u>See</u> Mikhak Decl. ¶ 25 & Ex. B ("8.1 Active Faculty Status").  Yet her interpretation is inconsistent with the rest of the handbook.  As the University observes, "faculty member" is an umbrella term used throughout the handbook to apply to numerous provisions relating to those individuals in a teaching capacity.  <u>See</u> Reply at 6–7; <u>see also</u> Taylor Decl. II Ex. A.  The specific instances her counsel cited fail to alter the interpretation of "faculty" defined in the "Faculty Model," <u>see</u> Taylor Decl. Ex. A, when "the whole of the contract is . . . taken together," <u>see</u> Cal. Civ. Code § 1641.  Additionally, Mikhak agreed to a characterization of herself as a faculty member when she accepted the electronic agreement entitled "Faculty Acknowledgment Detail," and when she signed various hiring forms.  <u>See</u> Mortensen Decl. Ex. 3; Taylor Decl. II ¶ 3.

Second, Mikhak's subjective misunderstanding is irrelevant because in California, "the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties . . . controls interpretation."  <u>Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.</u>, 109 Cal. App. 4th 944, 956 (Ct. App. 2003).  Despite Mikhak's subjective intent to accept the terms of the handbook "if and when I would become a faculty member, not while being a faculty candidate," the text of the handbook does not stipulate as such.  <u>See</u> Mikhak Decl. ¶ 22; <u>see generally</u> Taylor Decl. Ex. B.  The agreement's language objectively binds all faculty members, including candidates like Mikhak.  <u>See</u> Taylor Decl. Ex B ¶ 1.  Therefore, the Court finds that the parties manifested mutual assent and formed a valid contract.

## C.     Unconscionability

Mikhak also requests that the Court deny the Motion to Compel on the grounds that the arbitration agreement is unconscionable and therefore unenforceable.  <u>See</u> Opp'n at 7.

14

As noted in Section B, <u>supra</u>, the FAA generally preempts state-law contract defenses like unconscionability.  <u>See</u> <u>Mortensen</u>, 722 F.2d at 1159.  Nonetheless, "[u]nder the FAA, these defenses may provide grounds for invalidating an arbitration agreement if they are enforced evenhandedly and do not interfere with fundamental attributes of arbitration."  <u>Sanchez v. Valencia Holding Co., LLC</u>, 61 Cal. 4th 899, 906 (2015) (internal quotations omitted).  Even assuming against FAA preemption, the Court finds the contract not unconscionable.

Courts may refuse to enforce a contract or a specific clause within it when at the time of its formation it was unconscionable, or they may limit the application of any unconscionable clause.  Cal. Civ. Code. § 1670.5(a).  Unconscionability refers to "an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party."  <u>Sanchez</u>, 61 Cal. 4th at 910.  Unconscionability has both procedural and substantive elements and "is a valid reason for refusing to enforce an arbitration agreement."  <u>Armendariz v. Found. Health Psychcare Servs., Inc.</u>, 24 Cal. 4th 83, 114 (2000).  Procedural unconscionability focuses on the "manner in which the contract was negotiated and the circumstances of the party at the time," <u>Kinney v. United Healthcare Servs., Inc.</u>, 70 Cal. App. 4th 1322, 1329 (Ct. App. 1999), and is composed of two factors: oppression and surprise "due to unequal bargaining power."  <u>Armendariz</u>, 24 Cal. 4th at 114.  Oppression derives from a lack of "real negotiation and an absence of meaningful choice," whereas surprise arises from the terms of the bargain "hidden in a prolix printed form," <u>Bruni v. Didion</u>, 160 Cal. App. 4th 1272, 1288 (2008), or drafted in "fine-print terms," <u>Sanchez</u>, 61 Cal. 4th at 911.  Substantive unconscionability focuses on the "terms of the agreement and whether those terms are so one-sided as to shock the conscience."  <u>Kinney</u>, 70 Cal. App. 4th at 1330.  An arbitration provision is substantively unconscionable if it is "overly harsh" or generates "one-sided results."  <u>Armendariz</u>, 24 Cal. 4th at 114.   Both procedural and substantive unconscionability must be present before a court may refuse to enforce a contract, but they need not be present to the same degree.  <u>Armendariz</u>, 24 Cal. 4th at 114.  A sliding scale applies such that "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term

**United States District Court**
For the Northern District of California

1    is unenforceable, and vice versa." Id.

2              **1.    Procedural Unconscionability**

3         In California, courts consider adhesive contracts—standardized contracts in which the

4    party with lesser bargaining power lacked an opportunity to negotiate—procedurally

5    unconscionable to some degree.  Bridge Fund Capital Corp. v. Fastbucks Franchise Corp.,

6    622 F.3d 996, 1004 (9th Cir. 2010).  Yet adhesive contracts are not per se unconscionable,

7    see Sanchez, 61 Cal. 4th at 914; courts can only refuse to enforce those that are "unduly

8    oppressive."  See Armendariz, 24 Cal. 4th at 113.   In Armendariz, the California Supreme

9    Court found that an arbitration clause requiring employees to arbitrate discrimination claims

10   was adhesive and unconscionable because "[i]t was imposed on employees as a condition of

11   employment and there was no opportunity to negotiate." Id. at 114–15.

12        Also, in Circuit City, the Ninth Circuit found that an arbitration clause in a California

13   employment contract was procedurally unconscionable because it was a "contract of

14   adhesion." Circuit City Stores, Inc. v. Adams, 279 F.3d 889, 893 (9th Cir. 2002).  The

15   "standard-form contract drafted by the party with superior bargaining power," which job

16   applicants "were not permitted to modify," was a "prerequisite to employment." Id.  Ingle

17   held a similar arbitration clause signed by a separate employee also procedurally

18   unconscionable because of the "stark inequality of bargaining power" between Circuit City

19   and the employee.  Ingle v. Circuit City Stores, Inc., 328 F.3d 1165, 1171 (9th Cir. 2003).

20   That the job applicant had three days to consider the terms of the agreement before signing it

21   was "irrelevant" because "the availability of other options does not bear on whether a

22   contract is procedurally unconscionable." Id. at 1172.  The employee had no "meaningful

23   opportunity to decline . . . the arbitration agreement," which the employer presented on an

24   "adhere-or-reject basis." Id.  Thus the agreement was procedurally unconscionable.  Id.

25        The arbitration clause here is at least somewhat procedurally unconscionable due to its

26   oppressive nature.  The University argues that an adhesive contract involves the imposition

27   of "coercive pressure to sign" by the party with superior bargaining power.  Reply at 10

28   (citing King v. Larsen Realty, Inc., 121 Cal. App. 3d 349, 358 (Ct. App. 1981)).  As noted

                                                  16

**United States District Court**
For the Northern District of California

1    above, though, procedural unconscionability only requires "an absence of meaningful

2    choice" in the bargaining process, which is likely present here.  See <u>Bruni</u>, 160 Cal. App. 4th

3    at 1288.  Mikhak contends that the arbitration agreement was adhesive because she "had to

4    acknowledge and accept the arbitration policy if [she] desired to keep on working at UOP."

5    Opp'n at 9.  Mikhak received "a number of documents" concerning her hiring, including the

6    handbook.  Mikhak Decl. ¶ 9.  It is probably "irrelevant" that Mikhak had received the

7    corrected version one week before accepting it.  See <u>Ingle</u>, 328 F.3d at 1172 (declaring

8    "irrelevant" the three-day period the employee had).  Mikhak had to express "prompt digital

9    acknowledgment" of the new Faculty Handbook to avoid being "locked out of eCampus."

10   Taylor Decl. Ex. A.  The eCampus web portal enabled faculty members to "manage their

11   classes . . . check their class rosters, post grades, and receive student assignments" and served

12   as "their main interface with the University and with their students."  Taylor Decl. ¶ 5.

13   While barring continued usage of eCampus for failing to accept the arbitration provision is

14   not the same burden as making agreement to a clause a prerequisite to employment, like in

15   <u>Armendariz</u> or <u>Adams</u>, it likely would severely impede faculty members like Mikhak from

16   carrying on their class activities.  See <u>Armendariz</u>, 24 Cal. 4th at 114–15;  <u>Adams</u>, 279 F.3d

17   at 893.  Moreover, Mikhak lacked any chance to negotiate the terms of the agreement, and

18   the agreement did not enable faculty members to adjudicate their disputes outside of

19   arbitration.  <u>See generally</u> Taylor Decl. Ex. B.  This is just like in <u>Armendariz</u>, <u>Adams</u> and

20   <u>Ingle</u>, where the employees had no opportunity to negotiate the terms of the agreement.  <u>See</u>

21   <u>Armendariz</u>, 24 Cal. 4th at 114–15;  <u>Adams</u>, 279 F.3d at 893; <u>Ingle</u>, 328 F.3d at 1171.  The

22   University presented Mikhak with the arbitration agreement on an "adhere-or-reject basis."

23   <u>See</u> <u>Ingle</u>, 328 F.3d at 1171.

24        On the other hand, the arbitration clause did not involve much "surprise."  The

25   University emailed a link to the handbook explicitly instructing recipients to "pay special

26   attention to the new information in the following subsections . . . Section 3.13: Dispute

27   Resolution Policy and Procedure," which included the binding arbitration clause.  Taylor

28   Decl. Ex. A.  The Faculty Acknowledgment Detail emphasized this provision as well.  <u>See</u>

17

1  Mortensen Decl. Ex. 3 ("[B]y clicking 'Accept' below I am agreeing to arbitrate

2  employment-related legal claims . . . ."). This does not constitute hiding the agreement

3  among "prolix" code, see Bruni, 160 Cal. App. 4th at 1288, or in "fine-print terms," see

4  Sanchez, 61 Cal. 4th at 911. Mikhak also does not state that she was unaware of the clause's

5  presence. See Mikhak Decl. ¶ 18. Therefore, the agreement likely failed to surprise.

6      Based on the slightly oppressive nature of the adhesive agreement, the Court finds a

7  minimal amount of procedural unconscionability. However, "the agreement will be

8  enforceable unless the degree of substantive unconscionability is high." Peng v. First

9  Republic Bank, 219 Cal. App. 4th 1462, 1472 (2013).

10              **2.     Substantive Unconscionability**

11      Mikhak argues that the agreement is substantively unconscionable because: (a) the

12  University could "unilaterally revise the agreement"; (b) it had "control of the selection of

13  the arbitrator"; (c) it "d[id] not state that the University would be responsible for all

14  arbitration costs" and "seem[ed] to saddle the administrative costs on the employee"; (d) it

15  had a "lack of 'mutuality or bilaterality'" in the class action waiver; and (e) it "force[d]

16  confidentiality of . . . all aspects of the arbitration."[4] Opp'n at 9–10.

17              **a.     Unilateral modification**

18      First, the University has the power to "unilaterally revise the agreement." Opp'n at 9.

19  Armendariz held that an arbitration agreement must possess a "modicum of bilaterality"

20  whereby both the employers and the employees could arbitrate their disputes. Armendariz,

21  24 Cal. 4th at 117. Bilaterality affects the questions of the unilateral modification clause and

22  the class action waiver. In Ingle, the Ninth Circuit ruled that the employer's unilateral

23  modification clause was substantively unconscionable because it "grant[ed] itself the sole

24  authority to amend or terminate the arbitration agreement." Ingle, 328 F.3d at 1179; see also

25  Chavarria v. Ralphs Grocery Co., 733 F.3d 916, 926 (9th Cir. 2013) (affirming the rule in

26  Ingle). The Ingle agreement required notice of any change through "'posting a written notice

27  
_____

28       [4] Mikhak does not specifically refer to substantive unconscionability in making these arguments. See Opp'n at 9–10. They nonetheless deal with "the terms of the agreement," see Kinney, 70 Cal. App. 4th at 1330, and therefore the Court considers them in the context of substantive unconscionability.

by December 1 of each year at all Circuit City locations.'" <u>Ingle</u>, 328 F.3d at 1179 n.21. This "exiguous notice" was "trivial" because it gave the employee "no meaningful opportunity to negotiate the terms of the agreement." <u>Id.</u> at 1179.

On the other hand, <u>Slaughter v. Stewart Enters. Inc.</u>, No. C07-01157-MHP, 2007 WL 2255221, at *10 (N.D. Cal. Aug. 3, 2007) (Patel, J.), the court found that a unilateral modification clause was not substantively unconscionable. .  The challenged clause stated that the employer would not modify the agreement "without notifying [the employee] and obtaining [his/her] consent," but it "may change or modify the procedures from time to time without advance notice." <u>Id.</u>  The clause pertained to the contract as a whole, not to the specific arbitration provision. <u>Id.</u>  According to the court, "similar modification provisions—even where they grant an employer the unilateral right to modify the terms of the contract without providing advance notice—are not substantively unconscionable." <u>Id.</u> The modification clause "was limited by the duty to exercise the right of modification fairly and in good faith," and thus was not unconscionable "as a matter of law." <u>Id.</u>

In <u>Mohamed v. Uber Tech., Inc.</u>, 109 F. Supp. 3d 1185, 1228–30 (N.D. Cal. 2015) (Chen, J.), the court wrestled with this question and the previous two conflicting cases. <u>Mohamed v. Uber Tech.</u>, 109 F. Supp. 3d at 1228–30.  The clause at issue permitted Uber to modify the terms and conditions of the employee agreement "at any time," including the arbitration provision. <u>Id.</u> at 1228.  The duty of good faith described in <u>Slaughter</u> failed to persuade the court that Uber would not impose "all one-sided modifications." <u>Id.</u> at 1229. This could enable the drafting party to "abus[e] its modification power to render a contract unfairly one-sided." <u>Id.</u>  Noting a split in decisions by the state courts of appeal and the Ninth Circuit, and the absence of controlling state supreme court precedent, the court opted to follow the Ninth Circuit's decision in <u>Ingle</u> and ruled the modification clause substantively unconscionable. <u>Id.</u> at 1229–30.

Here, the unilateral modification clause pertains specifically to the arbitration agreement.  <u>See</u> Taylor Decl. Ex. B ¶ 2.  Revisions do not apply to any dispute retroactively "after that dispute has been submitted to arbitration" (and so would not apply to Mikhak's

19

**United States District Court**
For the Northern District of California

1    dispute), and the University commits to giving "at least thirty (30) days written notice to

2    faculty members" before making any modifications.  Id.  This written notice is more specific

3    than the yearly notice in the Ingle contract and certainly more than the clause permitting

4    changes "without advance notice" or "at any time" in Slaughter and Mohamed, respectively.

5    See Ingle, 328 F.3d at 1179; Slaughter, 2007 WL 2255221, at *10; Mohamed, 109 F. Supp.

6    3d at 1228.  The notice provides some fair warning to faculty members of changes in the

7    arbitration agreement and might diminish the substantive unconscionability of the agreement.

8    Yet following Mohamed, 109 F. Supp. 3d at 1229–30, and contrary to the University's

9    argument, in practice "the limits imposed by the covenant of good faith and fair dealing," see

10   Reply at 12, might not substantively protect against one-sided modifications favoring the

11   institution.  Furthermore, the clause does not enable faculty members to revise the agreement

12   either; it distinctly grants that sole authority to "[t]he Company," just like the clause in Ingle

13   did.  See Taylor Decl. Ex. B ¶ 2; Ingle, 328 F.3d at 1179.

14           As Mohamed notes, it remains unresolved if a unilateral modification clause is

15   substantively unconscionable.  The University's clause weighs less heavily in favor of the

16   drafter because it prohibits retroactive revisions and mandates thirty days' written advance

17   notice, yet it still withholds negotiation power from faculty members.  See Taylor Decl.

18   Ex. B ¶ 2.  Because the Ninth Circuit's Ingle decision is controlling for this Court, the Court

19   follows the logic in Mohamed and finds that this aspect weighs toward substantive

20   unconscionability.

21                          **b.        Control over the arbitrator**

22           Second, Mikhak alleges that the University "has control over the selection of the

23   arbitrator," because if the parties cannot agree to a neutral arbitrator, "then the American

24   Arbitration Association will handle the arbitration."  Opp'n at 9–10; see Taylor Decl. Ex. B

25   ¶ 3.  "[T]he neutral-arbitrator requirement . . . is essential to ensuring the integrity of

26   arbitration process."  Armendariz, 24 Cal. 4th at 103.  The agreement states: "[t]he parties

27   shall select the neutral arbitrator and/or arbitration sponsoring organization by mutual

28   agreement."  Taylor Decl. Ex. B ¶ 3.  Absent mutual agreement, the arbitration is held under

1    the auspices of the AAA.   Id.   Mikhak fails to explain how delegating the arbitration to the

2    AAA favors the University, especially since delegation would occur only if neither party

3    could agree on a neutral arbitrator.   The AAA is a "respected forum" for arbitration.   See

4    Azteca Const., Inc. v. ADR Consulting, Inc., 121 Cal. App. 4th 1156, 1168 (Ct. App. 2004).

5    The Court finds this argument unpersuasive.

6                        **c.        Responsibility for costs**

7            Third, Mikhak contends that the "cost considerations are highly confusing," but that

8    "any imposition of costs would impose a hardship on Plaintiff."   Opp'n at 10.   Presumably

9    this is because she has "more than $100,000 worth of federal student loans" and sought

10   employment with the University to become "financially stable" and pay off debts.   Mikhak

11   Decl. ¶¶ 28–29.   Mikhak also alleges that the agreement "seems to saddle the administrative

12   costs on the employee."   Opp'n at 10.

13           "[W]hen an employer imposes mandatory arbitration as a condition of employment,

14   the arbitration agreement or arbitration process cannot generally require the employee to bear

15   any type of expense that the employee would not be required to bear if he or she were free to

16   bring the action in court."   Armendariz, 24 Cal. 4th at 110–11.   Armendariz found that a

17   mandatory employment arbitration agreement that covered claims under the California Fair

18   Employment and Housing Act (FEHA) "impliedly oblige[d] the employer to pay all types of

19   costs that are unique to arbitration."   Id.   at 113.

20           The arbitration agreement states that "[t]he University shall initially bear the

21   administrative costs associated with the conduct of the arbitration."   Taylor Decl. Ex. B ¶ 7.

22   This is contingent only on "a one-time payment" by the faculty member "equal to the filing

23   fee then required by the court of general jurisdiction . . ." and "any subsequent award by the

24   Arbitrator."   Id.   The plain language requires the University to pay the administrative costs;

25   the use of the word "initially" does not necessarily mean Mikhak will have to shoulder future

26   payments associated with arbitration.   Also, Mikhak's complaint sought relief under the

27   federal Civil Rights Act and state FEHA.   See generally Compl.   Filings in federal court

28   entail fees.   Therefore the agreement is consistent with Armendariz because Mikhak would

United States District Court
For the Northern District of California

1    ordinary bear expenses in federal court that she otherwise would spend in arbitration.  See

2    Armendariz, 24 Cal. 4th at 110–11.  The Court finds this argument unpersuasive.

3                    **d.     Class action waivers**

4        Fourth, Mikhak alleges a lack of mutuality because "any claim that all or part of the

5    Class Action Waiver is unenforceable, unconscionable, void or voidable may be determined

6    only by a court of competent jurisdiction and not by an arbitrator."  Opp'n at 10; Taylor

7    Decl. Ex. B ¶ 6.  This waiver holds that "[t]here will be no right or authority for any dispute

8    to be brought, heard or arbitrated as a class . . . ."  Taylor Decl. Ex. B ¶ 6.

9        Class action waivers in arbitration clauses are not unconscionable.  Concepcion, 563

10   U.S. at 352; see also Sanchez, 61 Cal. 4th at 923 (observing that ". . . to find the class waiver

11   here unconscionable would run afoul of Concepcion").  Mikhak's contention that "only UOP

12   would utilize" this waiver, Opp'n at 10, contravenes the essential holding of Concepcion.

13   The Court finds this argument unpersuasive.

14                    **e.     Confidentiality**

15       Fifth, Mikhak contends that the agreement requires confidential arbitration

16   procedures.  Id.  The agreement provides: "[e]xcept as may be permitted or required by law,

17   as determined by the arbitrator, neither a party nor an arbitrator may disclose the existence,

18   content, or results of any arbitration hereunder without the prior written consent of all

19   parties."  Taylor Decl. Ex. B ¶ 9.  Mikhak relies on Section 7 of the National Labor Relations

20   Act, 29 U.S.C. § 157, see Opp'n at 10, but it is unclear why this statute is germane.

21       Confidentiality provisions in an arbitration agreement are not per se unconscionable

22   under California law, but courts must determine their scope in deciding whether to enforce

23   them.  Davis v. O'Melveny & Myers, 485 F.3d 1066, 1079 (9th Cir. 2007), overruled on

24   other grounds by Kilgore v. KeyBank, Nat'l Ass'n, 673 F.3d 947 (9th Cir. 2013).  "Although

25   facially neutral, confidentially provisions usually favor companies over individuals."  Ting v.

26   AT&T, 319 F.3d 1126, 1151 (9th Cir. 2003).

27       Ting ruled that the confidentiality provision in AT&T's consumer arbitration

28   agreement requiring "[a]ny arbitration to remain confidential" was substantively

United States District Court
For the Northern District of California

1  unconscionable.  Id. at 1151–52.  Although repeated disputes brought against AT&T would

2  enable arbitrators to "accumulate a body of knowledge on a particular company," the

3  confidentiality clause prohibited plaintiffs from "mitigat[ing] the advantages inherent in

4  being a repeat player."  Id.  This placed AT&T in a "far superior legal posture by ensuring

5  that none of its potential opponents have access to precedent" while the company could learn

6  "how to negotiate the terms of its own unilaterally crafted contract."  Id. at 1152.

7      Davis also found the confidentiality clause in O'Melveny & Myers's employee

8  arbitration agreement unconscionable because the clause "precludes even mention[ing] to

9  anyone 'not directly involved in the mediation or arbitration.'"  Davis, 485 F.3d at 1078.

10  This would "handicap if not stifle an employee's ability to investigate and engage in

11  discovery" and "prevent[] plaintiffs from accessing precedent."  Id.  Because the clause was

12  "written too broadly," the court ruled it unconscionable.  Id. at 1079.

13      Finally, Mohamed ruled Uber's confidentiality agreement substantively

14  unconscionable in a class action suit.  Mohamed, 109 F. Supp. 3d at 1227.  The agreement

15  nearly mirrored the University's here: "[e]xcept as may be permitted or required by law, as

16  determined by the Arbitrator, neither a party nor an Arbitrator may disclose the existence,

17  content, or results of any arbitration hereunder without the prior written consent of all the

18  Parties."  Id. at 1226.  The court observed that, like in Davis, Uber's agreement "precluded

19  any disclosures about an arbitration whatsoever to non-parties."  Id. at 1227.  "Under Ting

20  and Davis, the confidentiality clause is substantively unconscionable."  Id.

21      Here, like in Mohamed, the arbitrator has the authority to determine that disclosure is

22  permitted or required by law.  See id.; Taylor Decl. Ex. B ¶ 9.  Neither Ting nor Davis

23  provided such an exception.  See Ting, 319 F.3d at 1151 n.16 (excepting confidentiality only

24  "as may be required by law or to confirm and enforce an award."); Davis, 485 F.3d at 1071

25  (excepting confidentiality only "as may be necessary to enter judgment upon the award or to

26  the extent required by applicable law.").  It is difficult to reconcile this case with Mohamed's

27  ruling on an identical provision, but Mikhak does not argue that the confidentiality

28  agreement would handicap her ability to secure a fair resolution to her dispute.  Given

**United States District Court**
For the Northern District of California

1 Mikhak's position on the issue, the Court finds this argument unpersuasive.

2       Overall, the arbitration agreement appears to show only minor substantive

3 unconscionability due primarily to the unilateral modification clause.  This is not strong

4 enough in conjunction with the minimal procedural unconscionability of the agreement to

5 conclude that the agreement is unenforceable.  See Armendariz, 24 Cal. 4th at 114 ("[T]he

6 more substantively oppressive the contract term, the less evidence of procedural

7 unconscionability is required to come to the conclusion that the term is unenforceable.").

8 Aware of the "liberal federal policy favoring arbitration," see Concepcion, 563 U.S. at 339,

9 the Court finds that the arbitration agreement is not unconscionable and thus enforceable.

10           **D.       Arbitration of Title VII Claims**

11       Mikhak finally argues that mandatory arbitration of employment discrimination

12 claims arising under Title VII contravenes the purposes and spirit of the Civil Rights Act of

13 1964, and thus that the Court should refuse to enforce University's agreement as contrary to

14 public policy.  Opp'n at 11.  This argument is unpersuasive and unsubstantiated.

15 Employment discrimination cases brought under Title VII and other federal anti-

16 discrimination laws are subject to valid mandatory arbitration agreements.  See, e.g., Gilmer

17 v. Interstate/Johnson Lane Corp., 500 U.S. 20, 23 (1991) (ruling that "a claim under the Age

18 Discrimination Employment Act can be subject to compulsory arbitration pursuant to an

19 arbitration agreement."); E.E.O.C. v. Luce, Forward, Hamilton & Scripps, 345 F.3d 742,

20 750–51 (9th Cir. 2003) (en banc) (finding no conflict between "the purpose of Title VII and

21 compulsory arbitration of Title VII claims").  The Ninth Circuit is not alone; "[a]ll of the

22 other circuits have concluded that Title VII does not bar compulsory arbitration agreements."

23 Id. at 748–49 (enumerating holdings by every other circuit to this effect).  Indeed, Congress

24 "has subsequently rejected legislation" that would "preclud[e] waiver of a judicial form for

25 Title VII claims."  Id. at 753 n.9.  In California, "nothing in the 1991 [Civil Rights] Act

26 prohibits mandatory employment arbitration agreements that encompass state and federal

27 antidiscrimination claims."  Armendariz, 24 Cal. 4th at 96.

28       Here, Mikhak brings four claims arising under Title VII.  Compl. ¶¶ 93–120.  Because

the Civil Rights Act does not preclude arbitration of employment discrimination claims, her claims are arbitrable and the agreement is not unenforceable.  See Luce, 342 F.3d at 749.[5]

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Compel Arbitration is GRANTED. The case shall be STAYED pending the outcome of neutral arbitration of the substantive claims in accordance with the arbitration agreement in the 2014–2015 Faculty Handbook. See 9 U.S.C. § 3.  The Court does not delegate arbitrability to the arbitrator.

**IT IS SO ORDERED.**

Dated: June 21, 2016

_____
CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE

---

[5] In accordance with the principle of stare decisis, the Court also rejects Mikhak's last argument, that due to the passing of Justice Antonin Scalia the Court should refuse to follow the Supreme Court's FAA-related decisions favoring arbitration.  "Stare decisis . . . contributes to the actual and perceived integrity of the judicial process"  Payne v. Tennessee, 501 U.S. 808, 827 (1991).  "Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction.  It is not their function to attempt to overrule decisions of a higher court."  Auto Equity Sales, Inc. v. Super. Ct, 57 Cal. 2d. 540, 455 (1962) (en banc).

United States District Court
For the Northern District of California